**James CLARK et al., Plaintiffs,**

v.

**MARENGO COUNTY et al., Defendants.**

**UNITED STATES of America, Plaintiff,**

v.

**MARENGO COUNTY COMMISSION et al., Defendants.**

**Civ. A. Nos. 77–445–H, 78–474–H.**

United States District Court,
S. D. Alabama, N. D.

April 23, 1979.

J. L. Chestnut, Jr., Selma, Ala., for plaintiffs in No. 77–445–H.

Hugh A. Lloyd, Demopolis, Ala., for defendants Marengo County Board of Education, et al.

W. A. Kimbrough, Jr., U. S. Atty., Mobile, Ala., Gerald W. Jones, Paul F. Hancock, Sheila K. Delaney, Civ. Rights Div., Dept. of Justice, Washington, D.C., for plaintiff in No. 78–474–H.

W. W. Dinning, Demopolis, Ala., for defendant J. C. Camp, Chairman of the Marengo County Democratic Exec. Comm.

Edward S. Allen, Birmingham, Ala., for J. Marks Abernathy, Etc.

Cartledge W. Blackwell, Jr., Selma, Ala., for Marengo County, Ala. Commission, et al.

HAND, District Judge.

The first of the above-styled consolidated actions was initiated on August 15, 1977 by the filing of a complaint by Reverend James Clark, Jr., L. O. Hope, Clinton Agee, Teresa McNeal, John Davis, Robert Jones, and Eddie Ayers as purported representatives of a class composed of all black persons in Marengo County, Alabama. The defendants named in this complaint were Marengo County, a political subdivision of the State of Alabama; Sammy Daniels, individually and as Probate Judge of Marengo County; William H. Smith, individually and as Sheriff of Marengo County; Dwayne Sealey, individually and as Clerk of the Marengo County Circuit Court; Frank J. Norris, Jimmy Brame, James E. Edmonds, Grey Etheridge, and D. W. Holt, individually and as members of the Marengo County Board of Revenue; (Marengo County Commission); W. McKee and T. H. Miller, individually and as members of the Marengo County Board of Education; Joseph C. Camp, individually and as chairman of the Marengo County Democratic Executive Committee; and Robert Vance, individually and as chairman of the Alabama State Democratic Executive Committee.

For purposes of clarity, Civil Action No. 77–445–H will hereafter be referred to as the class action, while Civil Action No. 78–474–H will be referred to as the enforcement action.

The class action complaint alleged that black voters in Marengo County, Alabama are being deprived of their constitutional rights under the First, Thirteenth, Fourteenth, and Fifteenth Amendments to the United States Constitution by virtue of the fact that members of the Marengo County Commission and the Marengo County Board of Education are elected at large, and by virtue of the fact that the Marengo County Democratic Executive Committee is elected from allegedly mal-apportioned, multi-member districts, resulting in dilution or cancellation of black voting strength. The class action plaintiffs request that this Court declare the Acts under which the

Marengo County Commission and Board of Education are elected to be unconstitutional, declare the present method of electing County Democratic Executive Committee members to be unconstitutional, and to enjoin the certification of any future elections conducted in such an allegedly improper manner.

Upon a joint request by the parties, the Court allowed a nine month discovery period to and including June 1, 1978. The plaintiffs engaged in absolutely no discovery efforts in this period, which their attorney attributed to lack of finances. The Court notes that interrogatories were filed on the plaintiffs' behalf two months after the close of the discovery period—approximately three months late. The plaintiffs' counsel averred that his efforts had been directed toward securing intervention by the Department of Justice, rather than toward conducting discovery.

On December 9, 1977 the Court dismissed the class action complaint as against defendant Camp and the Marengo County Democratic Executive Committee on the authority of *Ray v. Blair,* 343 U.S. 214, 72 S.Ct. 654, 96 L.Ed. 852 & 894 (1952), and *Ray v. Garner,* 257 Ala. 168, 57 So.2d 824 (1952), holding that the election of County Democratic Executive Committee members was within the purview by law of the State Committee. *See Ala.Code,* § 17 -16-8.

The desires of the class action plaintiffs' counsel were finally fulfilled on August 25, 1978, when the Attorney General filed Civil Action No. 78-474-H, the enforcement action. In this suit the United States of America is the plaintiff. The named defendants are the Marengo County Commission and its members as set out above; the Marengo County Board of Education, its members as set out above, and other members Robert Tucker, Wallace Flowers, and Moses Lofton; Marengo County Probate Judge Sammy Daniels; J. C. Camp as chairman of the Marengo County Democratic Executive Committee; and J. Marks Abernathy as chairman of the Marengo County Republican Executive Committee. A recent amendment to the complaint added

as defendants Sheriff William H. Smith and Marengo County Circuit Clerk Dwayne Sealey.

The allegations of the enforcement action complaint are identical to those of the class action with respect to the at-large election of the Marengo County Commission and the Marengo County Board of Education, with contentions that such elections have served to dilute or cancel black voting strength in violation of the Fourteenth and Fifteenth Amendments to the United States Constitution. The government requests that this Court declare the at-large systems employed in the election of both the County Commission and the Board of Education to be violative of the Fourteenth and Fifteenth Amendments, to enjoin any future such at-large elections, and to require the adoption of an election system employing fairly drawn district lines for the conduct of future elections.

In each of the actions the defendants have denied that any aspect of the electoral system in Marengo County has served to deprive black persons of the right to vote or has cancelled or diluted their voting strength. On August 31, 1978 the Court consolidated the two cases for trial purposes, and the matters came on for trial before the Court in Selma, Alabama, on October 23, 1978, and on January 4, 1979. The Court, having considered the testimony and exhibits adduced at trial, the record in this case, and the arguments and memoranda of law propounded by counsel for all parties, together with the applicable law, finds as follows:

## FINDINGS OF FACT

1. Marengo County, Alabama, is a rural county located in West Central Alabama. It is bordered by Clarke County to the South, Wilcox and Dallas Counties to the East, Perry, Greene, and Hale Counties to the North, and Sumter and Choctaw Counties to the West. In 1950, Marengo County had a population of 29,494, consisting of 9,018 whites (31%), and 20,473 blacks (69%). The population decreased to 27,098 by 1960, with 10,270 whites (37.9%) and 16,828 blacks

(62.1%). *General Population Characteristics, Alabama,* U. S. Department of Commerce Bureau of the Census, pp. 2–85 (1960) [hereinafter 1960 Census]. The 1960 Census further reflects that of the 13,895 persons of voting age in Marengo County in 1960 there were 7,791 blacks (56.1%) and 6,104 whites (43.9%). By 1970 the population in Marengo County had declined to 23,819, with 13,157 blacks (55.2%) and 10,662 whites (44.8%). *General Population Characteristics, Alabama,* U. S. Department of Commerce Bureau of the Census (1970) [hereinafter 1970 Census]. The 1970 Census reflects that the voting age population was 14,113, with 7,164 blacks (50.8%) and 6,949 whites (49.2%). These figures indicate an exodus of blacks from Marengo County and a fairly stable white population.

The statistical evidence, as well as this Court's observations, indicates that the Marengo County populace has serious socioeconomic shortcomings, especially in the areas of literacy and economy. The 1970 Census figures reveal that 744 of the 11,861 persons of 25 years of age and older had never attended school and that 1,652 of that number had completed only four years of education or less, establishing that 20.2% of the total 1970 population aged 25 years or older had either never attended school or had not completed more than four years of formal education. The same census figures reveal that in 1970 there were 5,905 black persons in Marengo County aged 25 years or older, that 690 of these had never attended school, and that 1486 of these had attended school for four years or less. Thus, the 36.9% of the black population over 25 years of age either never attending school or completing four years or less greatly exceeds the county-wide percentage of 20.2%. The figures further reveal that of the 2,244 Marengo County families who were below the poverty level in 1970, 1,841 (82%) were black, and that while the median income for all families in 1970 was $4,909.00 with a mean income of $6,478.00, the black family's median income was $2,456.00 and its mean income was $3,175.00. *General Social and Economic Characteristics, Alabama,* Tables 124 & 128,

U. S. Department of Commerce Bureau of the Census (1970). The housing figures from the 1970 Census depict a similar pattern of black poverty. 3,045 (40%) of the 7,341 housing units in Marengo County in 1970 lacked some or all plumbing facilities, and 2,440 (71%) of the 3,357 housing units with black heads of household lacked some or all of such facilities. *General Housing Characteristics, Alabama,* pp. 2–74, U. S. Department of Commerce Bureau of the Census (1970). According to a 1976 survey, 2,824 (36%) of the 7,990 housing units in Marengo County were rated "sub-standard." State Housing Plan (June 1976) of the Alabama Development Office (Gov. Exhibit 47). Finally, Census figures reveal that the 1970 per capita income in Marengo County was $1,639.00, while for black persons it was only $722.00 (1970 Census, pp. 2–378 & 2–402).

From the foregoing figures, as well as from the Court's own observations, the Court finds that blacks in Marengo County still have a long way to go before they will have achieved socio-economic parity with the whites.

2. The Marengo County Commission was previously known as the Marengo County Board of Revenue and was created by Legislative enactment in 1923 to replace the pre-existing Court of County Commissioners. 1923 *Local Acts of Alabama,* No. 311, at 188. The Act provided that in the 1924 election and every four years thereafter the Board of Revenue was to be headed by a president elected at-large by the county electorate and was to be otherwise composed of four members, each representing a different residency district. The districts and the precincts comprising them were as follows:

Northeast: Faunsdale, Macon, Dayton, Thomaston, and McKinley;

Southeast: Magnolia, Pineville, Dixon's Mills, and Shiloh;

Southwest: Myrtlewood, Hills, Nanafalia, Horse Creek, Hoboken, and Sweetwater; and

Northwest: Demopolis, Jefferson, Springhill, Jackson Store, and Linden.

Under the 1923 Act, persons seeking a district board member's position ran only in the district in which they resided and were thus not answerable to voters residing in other districts.

In 1955 the 1923 legislation was amended to provide that a candidate seeking a board position had to run from the district in which he resided, but his candidacy was subject to the vote of the entire county electorate. 1955 *Acts of Alabama*, No. 17, at 45. Thus, for example, a candidate seeking a position on the Board representing the Northeast section would have to run against other persons who resided in the Northeast section but he would have to receive a majority vote of all voters in the county before he could be elected.

In 1966 the Act establishing the Board of Revenue was again amended by the Alabama Legislature. 1966 *Acts of Alabama*, No. 44, at 67. Act No. 44 required the election of a Board of Revenue member for the northwestern and the southeastern districts in 1968 and every four years thereafter, and the election of the at-large president and the northwestern and southwestern representatives in 1970 and every four years thereafter, thereby creating staggered terms. The 1966 amendment continued the rule set down in the 1955 amendment that any candidate for a Board of Revenue position be a resident of the district that he or she sought to represent for two years prior to his or her election or appointment.

This is the system under which the Marengo County Commission is now elected. The president of the Commission is elected at large and the members of the Commission, although required to run against other candidates in the district in which they reside, are also subject to a county-wide at-large vote.

3. The Marengo County Board of Education was first subjected to state legislation in 1935.[1] In that year, the Legislature passed an Act "[t]o further provide for and regulate the selection, qualification and election of the members of the Board of Education of Marengo County." 1935 *Local Acts of Alabama*, No. 183, at 106. Section 1 of the Act required that the Board consist of four members and a president. Section 2 provided that the president be elected at-large, and that the four other members of the Board be elected by district in the same manner and from the same districts as were used in the election of the Marengo County Board of Revenue under the 1923 Act. The Act went on to require that all candidates for Board membership be a resident of the district that he or she is elected to represent both at the time of the election and at all times during his or her continuance in office. Section 3 set out a six year term for each Board member and for the president, with all five members being elected during the same general election and every six years thereafter.

The preceding Act was amended in 1955 to require that a candidate for a Board position other than president be a resident of the district from which he or she is running for at least two years prior to his or her election, to require county-wide at-large elections instead of district elections, and to alter the terms of office to four years, commencing with the 1956 election for the four members, and the 1960 election for the president. 1955 *Acts of Alabama*, No. 184, at 458.

The law was last amended in 1966 to provide for staggered terms similar to those employed in the Marengo County Board of Revenue elections. 1966 *Acts of Alabama*, No. 44, at 67. Board members for the northeastern and southeastern districts were to be elected for four year terms in 1968, while the presidency and the northwestern and southwestern positions were to be contested in 1970 with subsequent four year terms.

 4. Both the class action plaintiffs and the government have alleged that the above-styled methods of electing the Marengo County Commission and the Marengo

---

1. As best the Court can ascertain, the election of the Marengo County Board of Education prior to 1935 was governed by the general state-wide legislation.

County Board of Education unconstitutionally dilute and cancel black voting strength. There can be no question but that the at-large scheme cannot be held to be per se unconstitutional. *White v. Regester*, 412 U.S. 755, 765, 93 S.Ct. 2332, 2339, 37 L.Ed.2d 314, 324 (1973); *Mahan v. Howell*, 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973). However, a plaintiff may establish the constitutional infirmity of such a system by demonstrating that a class of persons "had less opportunity than did other residents in the district to participate in the political processes and to elect legislators of their choice." *White v. Regester, supra*, 412 U.S. at 766, 93 S.Ct. at 2339, 37 L.Ed.2d at 324.

The Fifth Circuit, drawing from the Supreme Court opinion in *Whitcomb v. Chavis*, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971), has stated the considerations by which a District Court is to be guided in its deliberations on a voter dilution case:

> [W]here a minority can demonstrate a lack of access to the process of slating candidates, the unresponsiveness of legislators to their particularized interests, a tenuous state policy underlying the preference for multi-member or at-large districting, or that the existence of past discrimination in general precludes the effective participation in the election system, a strong case is made. Such proof is enhanced by a showing of the existence of large districts, majority vote requirements, anti-single shot provisions and the lack of provision for at-large candidates running from particular geographical subdistricts. The fact of dilution is established upon proof of the existence of an aggregate of these factors. The Supreme Court's recent pronouncement in *White v. Regester, supra*, demonstrates, however, that all these factors need not be proved in order to obtain relief.

*Zimmer v. McKeithen*, 485 F.2d 1297, 1305 (5th Cir. 1973) (en banc) (footnotes omitted). Accordingly, this Court's first duty is to enter findings, as revealed by the evidence, with respect to each the primary and enhancing factors set out in *Zimmer*.

**A. Slating.**

5. On the question of lack of openness in the slating process or candidate selection process to blacks, *Zimmer* requires the Court to consider whether either through law, custom, or practice blacks have been to any extent denied access to the slating procedures in Marengo County. 485 F.2d at 1305 n. 20.

Blacks in Marengo County were faced with extensive racial discrimination, both public and private, prior to the Voting Rights Act of 1965. While such discrimination undoubtedly continues in some areas of the county, the Act itself was the progenitor of a significant decrease in racially discriminatory practices. This diminution of discriminatory practices can be in large part attributed to orders of the federal court, congressional legislation, and efforts for change among the people of Marengo County, both white and black. Of course, while the late 1960's and the 1970's have seen great advancements in educational, employment, and social opportunities for black citizens, there can be no question, as this Court noted in *Bolden v. City of Mobile*, 423 F.Supp. 384, 387 (S.D.Ala.1976), aff'd, 571 F.2d 238 (5th Cir. 1978) (per Pittman, Ch. J.), but that "[t]he pervasive effects of past discrimination still substantially affects political black participation."

There is no allegation, and indeed there could be none, that the discrimination against black Marengo County voters arises out of law or official policy. Since the 1965 Act blacks have been entitled to vote without hindrance and there is no prohibition against blacks seeking any county office. The discrimination charged here is more subtle than that, and the issue for the Court is whether, notwithstanding the facially non-racial procedures, the processes "leading to nomination and election [are] . . . equally open to participation by the group in question . . . ." *White v. Regester, supra* 412 U.S. at 766, 93 S.Ct. at 2339, 37 L.Ed.2d at 324.

The first consideration of the Court is the number of black candidates who have sought county office and the number who

have succeeded. "The very fact that there have been such candidacies is 'suggestive of the fact that there is minority access to the nomination process.'" *Hendrix v. Joseph*, 559 F.2d 1265, 1268 (5th Cir. 1977), *quoting David v. Garrison*, 553 F.2d 923, 929 (5th Cir. 1977).

6. The evidence before the Court indicates that there had been no black candidates for any Marengo County office prior to the passage of the Voting Rights Act of 1965. Since 1966, however, the record is clear that blacks have sought such positions on many occasions, for the most part unsuccessfully.

7. In the May 3, 1966 Democratic primary, Annye Braxton became the first black to seek office in Marengo County when she ran for County Tax Assessor. She was opposed by three white men and she received a plurality (41%) of the 3,869 votes cast in the primary, to 2,626 votes received by her closest challenger (Government Exhibit 31). She was defeated by her white challenger, Sam Drinkard, in the Democratic primary run-off on May 31, 1966 by a vote of 5,461 to 4,041 (Government Exhibit 31).[2] The record reflects that Braxton carried many boxes in both the primary election and the run-off in predominately black areas such as Dayton, Dixon's Mills, Faunsdale, Putnam, Jefferson, Magnolia, McKinley, and Spring Hill, while she suffered great setbacks in many Demopolis and Linden boxes, in Lasca, in Macon, in Sardis, in Sweetwater, and in Wayne.

8. There were several black candidates in the November 1968 general election who assumedly ran as independents. All of these candidates were defeated, each receiving 34% to 37% of the vote. The two black candidates for delegates to the 1968 National Democratic Convention lost, although both won their way into the Democratic Primary run-off before being defeated.

9. In the May 5, 1970 Democratic primary the only black candidate was Joe Reed, who opposed two whites for Marengo County's seat in the state House of Representatives. Reed ran second in the primary, receiving approximately 37% of the vote. In the run-off Reed was defeated by 1,350 votes. Reed's strength was more or less in the same boxes as Braxton's had been in 1966, as were his weaknesses.

10. 1970 was a peak year for the National Democratic Party of Alabama, a state black political party whose purpose was to run black candidates for political office.[3] In the general election conducted on November 3, 1970, there were blacks on the ballot for almost every office contested, both county-wide and state-wide. In the Governor's race, NDPA candidate John Cashin ran second to the eventual winner George C. Wallace in Marengo County, receiving almost 40% of the votes cast. The same was in large part true with respect to the Lieutenant Governor's race, where the NDPA's Isaiah Hayes, III received approximately 36% of the Marengo County vote in losing to eventual winner Jere Beasley. In both of these races the blacks did well in the traditionally black areas such as Dayton, Dixon's Mill, Faunsdale, Jefferson, Magnolia, McKinley, and Spring Hill, while

---

**2.** Braxton testified at trial that she lost the run-off by about 200 votes and alleged that there were voting irregularities condoned in the form of deceased persons having ballots cast in their names. She stated that she passed her suspicions on to county officials and received no response. However, Braxton testified that she merely suspected such abuses and had no proof, and in light of the large number of votes by which Drinkard won, the Court sees no reason to give credence to such unsubstantiated suspicions.

**3.** Witness Eddie Ayers, an NDPA candidate in 1970, testified that the NDPA's primary purpose was to run black candidates for public office. The NDPA adopted the eagle as its emblem and advocated straight ticket voting. This was especially beneficial to illiterate voters who were thereby not required to read the ballot, but rather could simply pull the switch under the eagle. Ayers characterizes the NDPA as an independent political party, and says that its major advantage was that it permitted its candidates to run without paying a qualifying fee. The party was active in Marengo County for about two years, but is no longer active there.

losing in most Demopolis and Linden boxes and in the traditionally white areas of Lasca, Macon, Sardis, and Sweetwater. This is the same pattern as was seen in the Braxton race in 1966 and the Reed primary effort in 1970.

The same pattern is evident in other races in the November 3, 1970 general election (Government Exhibit 31). Due to the staggered term requirement enacted in 1966, the only Marengo County Commission offices to be contested were the presidency and the Northwest and Southwest district commissioner positions. The Board of Education positions open were the presidency and the Northeast and Southeast district positions. In the race for the presidency of the County Commission Frank Norris, the white incumbent, defeated R. J. Hayes, the NDPA candidate, by a vote of 5,736 to 3,354, garnering 64% of the votes. Grey Etheridge, the white incumbent, was unopposed in the Southwest District, but in the Northwest District W. T. Glass, the white incumbent, defeated NDPA candidate Henry Haskins by a vote of 5,707 to 3,324, another 64/36 vote. In the race for presidency of the Marengo County Board of Education M. W. McKee, a white, was opposed by NDPA candidate Velma Lankston, whom he defeated by a vote of 5,665 to 3,380, capturing 63% of the vote. In the

Board of Education race for member from the Northeast District, T. A. Moseley, the white candidate, defeated NDPA candidate Arthur Wood by a vote of 5,679 to 3,272, another 63/37 count. Finally, in the race for Southeast member of the Board of Education, J. B. Norris, the white candidate, defeated NDPA candidate T. R. Hayes by a vote of 5,673 to 3,397, again a 63/37 vote. In each of these elections the blacks were successful in the same boxes as Cashin and Hayes, and were also unsuccessful in the same boxes. In fact, the returns from most boxes were virtually identical in the different races.[4]

This pattern also held true in the 1970 election in the other contested races in Marengo County for Representative to the U. S. Congress, State Board of Education, State Senator, Probate Judge and Sheriff, and in the two state House of Representative races. In the congressional confrontation Walter Flowers, the white incumbent, carried Marengo County, receiving 5,672 votes to 3,272 for NDPA candidate T. Y. Rogers. In the State Board of Education race Victor Poole beat Hood of the NDPA by a count of 5,614 to 3,239. In the State Senate race the white Democratic candidate, W. H. Lindsay, received 5,216 votes to 3,245 for NDPA candidate D. B. Wilson and

4. The following breakdown is gleaned from the election returns of November 3, 1970, as set out in Government's Exhibit 31:

| | F. Norris | R. J. Hayes | Glass | Haskins | McKee | Lankston | Moseley | Wood | J. B. Norris | T. R. Hayes |
|---|---|---|---|---|---|---|---|---|---|---|
| Dayton | 37 | 82 | 36 | 81 | 38 | 81 | 35 | 81 | 35 | 82 |
| Demopolis—1 | 200 | 169 | 200 | 174 | 196 | 170 | 198 | 167 | 200 | 170 |
| Demopolis—4w | 734 | 10 | 735 | 10 | 731 | 10 | 729 | 11 | 723 | 14 |
| Lasca | 30 | 3 | 30 | 2 | 30 | 3 | 30 | 3 | 30 | 3 |
| Jefferson | 99 | 213 | 101 | 229 | 99 | 299 | 98 | 227 | 97 | 231 |
| Linden—3 | 413 | 179 | 413 | 180 | 416 | 179 | 413 | 179 | 413 | 182 |
| Macon | 47 | 14 | 47 | 14 | 47 | 14 | 47 | 14 | 47 | 14 |
| Sardis | 50 | 2 | 50 | 2 | 50 | 2 | 50 | 2 | 49 | 2 |
| McKinley | 127 | 77 | 127 | 77 | 126 | 77 | 125 | 77 | 126 | 77 |
| Sweetwater | 275 | 170 | 279 | 163 | 275 | 167 | 275 | 161 | 278 | 175 |

These figures were similar to those in the Wallace-Cashin and Beasley-Hayes confrontations, and, indeed, were followed in every race in which a black faced a white. The figures are set forth only to demonstrate the racial polarity in the voting in these areas and, while they do not include all results, they are indicative of the county-wide vote.

562 for Republican candidate E. T. Rolison, Jr. Sammie Daniels won the race for Probate Judge over NDPA's Eddie Ayers by a vote of 5,746 to 3,330. In the Sheriff's race Billy Smith, the white incumbent, won 5,504 to 3,257 over Thomas J. Smith of the NDPA. In the two state house races Pruitt and Manley defeated NDPA candidates Scott and Nixon by votes of 5,540 to 3,069 and 5,600 to 3,372, respectively. The Court notes that the white candidates in each of these elections received between 60% and 65% of the vote, and the box by box returns indicate that black support and white support were centered in the same areas as in the other elections.[5]

11. There were several black candidates in the 1972 general election, none garnering more than 22.2% of the vote and most receiving only 10% to 20%. The two blacks in the 1974 Democratic Primary received almost 35% of the vote, but the blacks in the November 1974 general election all received only 22% to 25% of the vote. The one black candidate in the 1976 Democratic Primary received 41.4% of the vote.

12. In the most recent Democratic primary conducted on September 5, 1978, there were three black candidates for county-wide office. Ludie Pearson, a black, challenged two white candidates, John C. Ramsey and Patsy Compton Rogers, for the Democratic nomination to the office of Marengo County Tax Assessor. Ramsey received 3,372 votes to 1,600 for Rogers and 1,556 for Pearson, and Ramsey thus received the nomination without the necessity of a run-off. In the race for President of the County Commission Robert W. Jones, Jr., a black, faced white incumbent Frank Norris and Tommy Ray, another white. A run-off was required when Norris got 3138 votes in the primary to 2186 for Jones and 1341 for Ray. In the run-off, held September 26, 1978, Norris outpolled Jones 4,371 to 2,852 to receive the party's nomination. The final black candidate was Clarence Abernathy, who was opposed by two whites, Charles McCray and Mike Slocum, in the race for Marengo County Coroner. Again, a run-off was required as Abernathy captured 1,183 votes to 2,771 for McCray and 618 for Slocum. Abernathy was successful in the run-off, however, and he became the first black ever elected to county-wide office in Marengo County when he defeated McCray in the run-off 3,719 to 3,617. In the only other run-off in 1978 in which a black faced a white Richard Shelby, the white candidate for U. S. Congress, outpolled Chris McNair, the black candidate, 3,802 to 2,784 in Marengo County. The Court notes from the box by box returns supplied by the Government (Government's Exhibits 33 & 34) that the polarity in voting observed in the 1970 general election returns is not nearly so pronounced in the 1978 run-off.[6]

5. *See* Note 4, *supra.*

6. The following breakdown of the same boxes surveyed in the 1970 general election returns indicates that the voting patterns in 1978 have changed somewhat from those in 1970 (the black and white totals are the number by race of persons voting in the run-off as set out by Government Exhibit 39):

| | McNair | Shelby | Jones | Norris | Abernathy | McCray | Black | White |
|---|---|---|---|---|---|---|---|---|
| Dayton | 80 | 40 | 90 | 36 | 100 | 26 | 85 | 45 |
| Demopolis—1 | 143 | 122 | 190 | 120 | 170 | 133 | 200 | 126 |
| Demopolis—4w | 147 | 635 | 116 | 769 | 105 | 689 | — | — |
| Lasca | 4 | 23 | 1 | 30 | 4 | 26 | — | — |
| Jefferson | 163 | 74 | 189 | 64 | 175 | 76 | — | — |
| Linden—3 | 171 | 289 | 129 | 351 | 281 | 237 | 168 | 377 |
| Macon | 22 | 23 | 13 | 33 | 18 | 28 | — | — |
| Sardis | 3 | 41 | 5 | 41 | 9 | 33 | — | — |
| McKinley | 105 | 47 | 78 | 81 | 126 | 41 | 135 | 46 |
| Sweetwater | 94 | 147 | 80 | 206 | 137 | 156 | 124 | 215 |

These figures indicate to the Court that while racial polarity may continue to play a role in Marengo County elections, it is now by no means as pervasive an influence as it has been in the past.

13. The foregoing recitation revealing the lack of success in the past on the part of black candidates in Marengo County due to general polarization in black and white voting is not indicative of a lack of access to the political system. The access guideline touches upon whether the political processes are open to minorities, not on whether such minorities are successful once access has been obtained.[7]

14. While the Court concludes that lack of success at the polls is not indicative of any lack of minority access, it is incumbent upon the Court to look further to ensure that the access facially apparent is not actually illusory. In this respect the plaintiffs point to inequalities in the appointment of election officials, bloc voting along racial lines, and present oppression stemming from a history of racial discrimination as causes of an actual lack of minority access to the facially neutral political system in Marengo County. The plaintiffs contend that the amalgamation of these problems has resulted in a lack of realistic access.

15. On the poll official appointment question, the plaintiffs allege that the appointments made by the County Appointing Authority[8] have been racially motivated and tend toward tokenism. They contend that it is important to have black poll officials so that black voters will have more confidence in the electoral system. The evidence before the Court reflects that the assertions of the plaintiffs with respect to appointments are to a large extent true. Sim Essex, Jr., testified that at the Jefferson polling place at which he votes and where 70% of the voters are black there were only two blacks among the eight election officials at the most recent election. Arthur Woods testified that only one of the officials at the polling place in predominately black Faunsdale is black. The Court has not been provided with a box by box breakdown of the number of poll officials by race, but one member of the County Appointing Authority testified that one black was appointed at each polling place for the 1970 election, and there is no evidence that this number has increased to any great extent.

The appointment of poll officials is regulated by state law. Section 17–16–17 of the Alabama Code provides that, for primary elections, the county committee of the political party conducting the election may certify to the County Appointing Authority six persons to act as poll officials in each precinct.[9] This list is presented to the County

---

7. This Court does not subscribe to the access theory adopted in *Bolden v. City of Mobile,* 423 F.Supp. 384, 389 (S.D.Ala.1976), and *Brown v. Moore,* 428 F.Supp. 1123, 1128 (S.D.Ala.1976), that demonstration of an at-large system that precludes black participation by virtue of racially polarized voting is sufficient to establish a lack of minority access to the political system. While this may have been the rule in *Bolden,* and while the Fifth Circuit may have acquiesced in the finding, *Bolden v. City of Mobile,* 571 F.2d 238, 243 (5th Cir. 1978), it must be remembered that *Bolden* and *Brown* dealt with an electorate that is approximately 65% white and 35% non-white, while the evidence before the Court in the matter *sub judice* indicates that the populace of Marengo County is majority black while the ranks of voters are almost equally split. On this basis, the Court is more cognizant of the Fifth Circuit's language in *Nevett v. Sides,* 571 F.2d 209, 227 (5th Cir. 1978) (*Nevett II*), where the Court, dealing with an electorate fairly evenly split along racial lines, concluded that "[t]he success or failure of black candidates appears to depend not upon any barriers to access to the slating or registration stages of Fairfield's political processes but upon racially polarized voting in an at-large setting and the shifting racial makeup of the voting population." In the similar matter *sub judice* the Court is convinced that the lack of black success in Marengo County elections results not from a lack of access to the political system, but rather from a failure of the blacks to turn out as many of their half of the voters as do the whites.

8. The appointing authority under Alabama law consists of the County Judge of Probate, Sheriff, and Circuit Court Clerk. *Ala.Code,* § 17–6–1.

9. Under the statute, candidates for nomination "may, at least 25 days before the primary, present to the county executive committee of his party a list of election officers desired by him for any one or more of the . . . pre-

Appointing Authority which then appoints the poll officials, usually going by the supplied lists. On this basis and under the facts of this case the Court is not particularly surprised that blacks have not received what they considered to be their fair share of appointments. Under the state statutory framework black candidates are allowed to suggest qualified persons to serve in these positions. They have not done so. This puts the burden on the Marengo County Democratic Executive Committee to submit names of proposed officials, and, while there have doubtless been many new appointments made, it is much easier to rely upon prior appointments than to seek out inexperienced but qualified replacements.[10] The Court is concerned that such procedures are inequitable to the extent that they serve to limit participation by blacks in the political process, but the Court is convinced that this inequity is not of such magnitude as to deprive blacks of access to the political process.[11]

■ 16. The second issue raised by the plaintiffs in this action touching upon access is the polarization in white and black voting. This polarization was described in *Bolden,* 423 F.Supp. at 388, as "white voting for white and black for black if a white is opposed to a black, or if the race is between two white candidates and one candidate is identified with a favorable vote in the black wards, or identified with sponsoring particularized black needs." The Court in *Bolden* noted that "[w]hen this occurs, a white blacklash occurs which usually results in the defeat of the black candidate or the white candidate identified with the blacks." *Id.*

There can be no question but that such polarization exists among white and black voters in Marengo County, although perhaps not quite so seriously today as has been the case in the past.[12] However, as the Court noted earlier in this opinion, it is difficult, perhaps impossible, to conceive how such polarization can possibly be found

cincts." *Ala.Code,* § 17 16 17. The evidence before the Court revealed that such lists are rarely forwarded to the county committee; the committee generally makes up its lists from names of previous poll officials and other persons. The plaintiffs contended that black candidate Ludie Pearson's submission of names for the 1978 primary was improperly ignored by the Marengo County Democratic Executive Committee, but the evidence revealed that Pearson's submission was not timely under the statute and was thus not due to be considered. (Government's Exhibits 13 & 14).

**10.** The Marengo County Democratic Executive Committee has 34 members, seven of whom are black. The black members have suggested in the past that the Committee submit an equal number of black and white names to the appointing authority, but the Committee Chairman Joseph Camp took the position that they should not be guided by quotas but rather should seek out the most qualified officials. In his testimony Camp admitted that there are blacks in Marengo County who are qualified to serve as poll officials, but he had no explanation for why more had not been appointed.

**11.** The obvious reason for concern on this issue is the fact that such officials are of great importance to the illiterate voters of Marengo County. Although under Alabama law an illiterate

voter is entitled to have anyone of his choice to aid him in preparing his ballot, *Ala. Code,* § 17 16 27, the evidence before the Court revealed that in most cases it is the election officials who are called upon to render such assistance. The Court can certainly agree that a black illiterate voter would have more confidence in the assistance rendered by another black, as would a white with a white. However, as the Court notes in the text, this issue does not serve to in any way limit access to the political system.

**12.** *Compare* Notes 4 & 6, *supra.* The Court's own analysis of the bloc voting issue is perhaps simplistic, since it relies upon a box by box examination and comparison of the votes received by black and white candidates in both predominately black and predominately white areas. The experts for both the plaintiffs and the defendants relied upon regression analysis to indicate the nature and extent of bloc voting. The expert testimony and the experts' scientific analyses of past election returns established only what the Court had determined through its simple comparative analysis—that bloc voting along racial lines has existed since blacks have had the right to vote in Marengo County and, although there is still a great deal of racially motivated voting present, the problem is not so bad now as it previously had been.

to be an obstacle to black access to the political system in a county in which blacks control close to 50% of the voting strength. Counsel for all parties agreed in open court that there are 16,000 in people in Marengo County who are qualified to vote, 44% of whom are black. While the Court itself doubts this stipulation as to the total number of qualified voters, assuming *arguendo* that blacks do comprise 44% of this voting population, they would control 7,040 votes. The Court has surveyed the election returns provided by the Government for elections conducted between 1966 and 1978 in Marengo County (Government Exhibit 31), and notes that Billy Smith's 7,073 votes in the 1974 Democratic primary is the largest total compiled (he was not opposed by a black), while most winners have generally garnered only 5,000 to 6,000 votes. Therefore, it is clear that if the blacks could overcome voter apathy and turn out their votes, they could succeed in spite of polarization. Accordingly, the Court finds that the polarization in black and white voting is an obstacle to black success at the polls but has little bearing on the access of blacks to the Marengo County political system. *See Nevett*

*v. Sides,* 571 F.2d 209, 227 (5th Cir. 1978) (*Nevett II* ).

17. The plaintiffs' final contention touching upon minority access argues that blacks have been denied access by virtue of oppressive racism on the part of Marengo County public officials, both past and present, and on the part of private individuals. Such oppression, the plaintiffs argue, has taken many forms that, when considered in the aggregate, serve to limit or preclude minority access.

The most vexatious form of oppression cited by the plaintiffs is the alleged intimidation of black voters by whites. Various witnesses testified that they knew of occasions where black sharecroppers had been carried to the polls by white landowners who dictated to them how they were to vote. Despite this testimony, the plaintiffs were unable to produce a single black who had been so intimidated,[13] and the Court can therefore give no credence to the allegations.

 Another form of alleged oppression leading to lack of access has been the

**13.** One witness called by the Government, Reatha Pritchett, testified to other forms of oppression allegedly carried on by Marengo County Board of Education Superintendent Fred Ramsey. Pritchett testified that she had seen letters from Ramsey to at least six different Board of Education employees directing them to vote in a certain manner and implying that their jobs might be in jeopardy if they did not follow his instructions. On the basis of this testimony, the Court subpoenaed the six persons to whom the letters were allegedly directed, all of whom unconditionally denied that they had ever received such letters or anything like them. Only three of the six were Marengo County residents. On the basis of this, the Court is convinced that Pritchett's testimony, if not amounting to outright perjury, is at least so lacking in credibility as not to merit the Court's consideration in any respect.

While on the issue of Mrs. Pritchett's testimony, the Court would like to take this opportunity to condemn the efforts of the Government attorneys so that memorialization on the official record may aid in preventing such improper behavior in the future. There can be no question that the decision by the United States Attorneys involved in this case to put Mrs.

Pritchett on the stand bordered on incompetence, since the veracity of her statements could have been easily checked prior to trial. This, however, is not an extremely unusual practice among attorneys and would not have drawn the Court's wrath had they subsequently acted professionally with respect to the matter. They did not. The Court subpoenaed the six persons allegedly receiving the missives from Ramsey and ordered them to appear in Court at 8:30 a. m. on October 25, 1978. The Court's witnesses all appeared in accordance with the terms of the subpoenas and were in the hall outside the courtroom at the appointed time, although Court was not to commence until 9:00 a. m. Without permission of the Court, and without even communicating their intent to the Court, the United States Attorneys took the Court's witnesses into their office, along with Mrs. Pritchett. The Court has no knowledge of what transpired therein, but the entire episode reeks of impropriety and disregard for ethical behavior. Such conduct is especially of concern to the Court in consideration of the fact that these attorneys are representatives of the United States Government. See Note 21 *infra* for further observations by the Court on the conduct of these attorneys.

conduct of the Marengo County Board of Registrars, before whom all persons must appear in order to be certified as qualified to vote. The first issue raised concerned the hours the Board is open, with one witness complaining that the brevity of the registration hours serves to discriminate against blacks. The testimony revealed that the Board generally is open from 9:00 a. m. to 4:00 p. m. on the first and third Monday of each month, and that the Board had been open every day from July 1978 to the time of the elections because it was an election year. Christine Spidle, a member of the Board, testified that the Board has never received a request that they stay open for longer or for different hours. The Court fails to see how such a policy in any way discriminates either against blacks or in favor of whites. A second complaint registered against the Board of Registrars is that it meets only in Linden, the county seat, which is often inconvenient to rural residents who wish to register. Mrs. Spidle testified that the Board once convened in Demopolis, but that this was the only time that the Board has met outside of Linden. Such intransigence was contrary to state law, since Section 17-4-1 of the *Alabama Code,* before its repeal, required the registrars to visit each precinct in the County at least once every two years, with proper notice preceding their appearance. The Court does not find the failure to comply with the statute necessarily discriminatory toward blacks, since all rural residents were inconvenienced by the failure. The Court does note, however, that more blacks than whites were so inconvenienced. The final complaint against the Board of Registrars is its failure to appoint deputy registrars to aid the Board in registering voters, which the Board is empowered to do under Section 17 4 158 of the *Alabama Code.* Earnest Palmer, a black, testified that he volunteered his services to the Board in this capacity (Government Exhibit 1), but the Board never acted upon this. Of course, such a decision is discretionary with the Board, and so long as the Board is not discriminating on a racial basis in terms of its policies, the Court is not constrained to find any misfeasance in the Board's failure to affirmatively act to facilitate the registration process to any greater extent than it already is available. However, since the Board of Registrars is duty bound to register all the voters in Marengo County that are qualified to vote, the Court would think that any program by which their job was made easier, such as the appointment of deputy registrars, would deserve serious consideration.

■ The final area of alleged oppression that the plaintiffs contend amounts to a lack of minority access or evidence thereof is denial of access to the ballot. The evidence reveals that on only one occasion has a black been denied a position on a ballot, and the Court is of the opinion from the evidence presented that there was no racial motivation underlying the denial of that ballot position. On July 5, 1978 J. H. Davis, a black, appeared in the office of Joe Camp, the Chairman of the Marengo County Democratic Executive Committee, to file qualifying papers in order to seek the Democratic nomination for Marengo County Commissioner representing the Northeast District. Camp provided Davis with the qualifying papers, which Davis filled out (Government Exhibit 7). Davis then informed Camp that he was a pauper and that he would like to get an exemption from paying the qualifying fee. Camp prepared a pauper's oath which Davis swore to and signed (Government Exhibit 7A), and both parties thought that Davis was thereby fully qualified to run. However, Camp was unfamiliar with the Democratic Party rules regarding fee waivers, and it was not until later on the same day that he learned from the State Committee that an application for a fee waiver must be accompanied by a petition signed by ¼ of 1% of the registered voters in the county.[14] After learning of this, Camp wrote to Davis and informed him of

---

14. Article VII, § 6(c) of the Rules of the Democratic Party as adopted by the State Democratic Executive Committee on January 31, 1970 (Government Exhibit 12).

the petition requirement, and explained that since the filing deadline was July 7, 1978, he would have to refile in accordance with the petition requirements very quickly if he wanted to be on the ballot (Government Exhibit 11). Davis did not refile and thus his name did not appear on the ballot. He testified that he never received Camp's letter, but whether he did or not it is clear to the Court that the denial of access to the ballot resulted not from any racial motivation but rather from the County Chairman's unfamiliarity with the rules of his party.

18. None of the foregoing collateral issues touching upon minority access persuade the Court that Marengo County blacks have been denied access to the political system. The evidence is clear that any qualified elector may seek political office in Marengo County, and that neither *de jure* nor *de facto* impediments serve to restrict this right.

*B. Responsiveness of Elected Officials to the Black Populace of Marengo County.*

19. In *Hendrix, supra,* the Fifth Circuit characterized the District Court's inquiry in this area as follows:

The analysis of the responsiveness question requires a consideration of two distinct problems. The first is the provision of governmental services to minority communities. This is the area in which citizens must typically rely on their local government for equal treatment.

\* \* \* \* \* \* \*

The second problem faced in making the responsiveness analysis "concerns the distribution of [county] jobs and appointments to various boards and commissions."

*Hendrix v. Joseph, supra* at 1268–69, *quoting in part Davis v. Garrison, supra* at 929.

Accordingly, it is this Court's duty in this area to enter its findings in these two specific areas, together with any other findings bearing upon responsiveness of elected officials.

20. With respect to the provision of governmental services to minority communities, the plaintiffs rely heavily on evidence reflecting poor roads in some predominately black areas to support their contention that the Marengo County Commission has been unresponsive to black needs.

In Marengo County, each county commissioner has the responsibility for maintaining the county roads in the district from which he is elected. The roads are under a district system under which each commissioner has his own road crew and equipment, and each commissioner is responsible for the hiring of his crew. Thus there are four separate county road crews in Marengo County, as opposed to the one centrally located road crew found in other counties that operate under the unit system.

There are 675.6 miles of road in Marengo County, of which 317.7 miles are paved and 357.9 miles are unpaved.[15] Maintenance of the paved roads is handled by the County Engineer, while the commissioners have the responsibility for the upkeep of the unpaved roads.

21. The evidence of the plaintiffs respecting Marengo County roads indicated that the roads in most predominately black areas are unpaved, and that such roads are often in terrible condition during and after adverse weather conditions. There was testimony with specific respect to three unpaved roads in the county that allegedly demonstrate the conditions throughout the county.

First, in the predominately black Old Spring Hill area there is an unpaved road that, according to the testimony of one wit-

---

15. These mileage figures are derived from testimony by Marengo County Engineer Hollis Glass. According to Glass, the figures include all public roads, but they do not include city streets.

ness, if completed would cut 10 to 15 miles off of the trip from Old Spring Hill to Demopolis. This witness, Eddie Ayers, testified that he has tried unsuccessfully for the past eight years to get the County Commission to rebuild the road,[16] and another witness, Irnetta Murdoch, testified that she too has been unsuccessful in her attempts to get the road repaired or rebuilt.[17] Both of these witnesses testified that during bad weather the road becomes almost impassable, but they conceded that the road is usable under normal conditions.

A second specific road problem revealed by the evidence concerned an unpaved road in the Southeast district that goes from Flatwood on Highway 5 to Highway 28, another predominately black area. A store proprietor on this road testified that prior to recent repairs by the county the road was in very bad shape, although it appears to the Court that the road was impassable only under the worst of conditions. The witness, Flora Moore, testified that two years passed between the time she initially complained about the road to county employees and the time that the repairs were actually effectuated.[18] The road has now been graveled and is ready for paving if and when the funds are available.

 The final road receiving testimony in this case is in the Vineland area of the Southeast District. This road serves four black families in the area and one witness testified that in rainy weather the road becomes impassable, preventing him from leaving the area, and on some occasions preventing the postman from entering the area or negotiating the road.[19] This witness, L. O. Hope, testified that he carried a petition signed by other local residents to his commissioner requesting that the road be blacktopped, but he was told that there were no funds for this.[20] Later, approximately 75% of the road was graveled, but no repairs have yet been made on a one lane bridge that has caused problems, nor have any repairs been made on another road that residents of the area formerly used as an exit from the area during bad weather. Another resident living on this road, Norman Richardson, cast great doubt

---

**16.** Ayers testified that a county work crew once commenced work on the road, but they stopped shortly thereafter and no work is now going on on the road.

**17.** The Court is not certain that the commissioner's refusal to respond to Murdoch's request had anything to do with her race. Murdoch testified that she complained to her commissioner, Jack Holt, on September 28, 1978, which was shortly after he lost his bid for re-election. He responded that she could forget about getting anything before the new commissioner took office in four months. It appears to the Court more likely that Murdoch was having a brush with lame-duck politics, not racial discrimination.

**18.** The Court notes that Moore never complained to her commissioner about the road; presumably she expected that her complaint would be passed on to the commissioner by the road crew employees. The commissioner for the Southeast District James Edmonds, testified that the recent repairs to the road were made without request, and that Moore's complaints had not been passed along to him. Edmonds testified that one reason the complaint might not have been passed on to him is that

his employees do not have to run for re-election, so they are less likely to exhibit the same concern for complaints as Edmonds does.

**19.** Hope's assertions regarding the difficulties of the postal carrier are overstated. Gov. Exhibit 49, consisting of certified copies of rural carrier trip reports filed by the carrier for Hope's area, reveal that between 10–11–75 and 11–3–78 the carrier, J. R. Spinks, has been stuck twice, has been snowed out once, and has on one occasion noted bad roads. This three year record is hardly evidence of impassable roads.

**20.** The Minutes of the Marengo County Commission meeting of January 8, 1977 (Gov. Exhibit 26) reflect that Hope appeared before the Commission with his wife and others and presented a petition stating that the community road needed graveling, the bridges needed to be repaired, and that all efforts to get relief from Commissioner James Edmonds had been unsuccessful. The minutes reflect that the Commission agreed after presentation of the petition that the road was to be graveled as soon as weather permitted. The evidence does not reflect when the graveling was done, but the road has been graveled since that meeting.

on the problems asserted by Hope. Richardson testified that he refused to sign the petition presented by Hope to the Commission, and that, while the road is sometimes flooded by two nearby creeks, he has never been unable to drive on the road, which he drives on twice a day. The sum of the evidence concerning this road convinces the Court only that a single commissioner may have been unresponsive to the people's needs, and that his unresponsiveness was cured by the Commission as a whole when the problem was brought to their attention.[21]

22. The evidence reveals that while some of the unpaved roads in the predominately black areas do suffer in inclement weather, the commissioners have maintained the county roads on a nondiscriminatory basis. Road paving and graveling are conducted in both predominately white and predominately black areas. The most serious deficiencies in the unpaved roads appear to result from a combination of bad weather, the highly plastic clay indigenous to Marengo County, and from the use of the roads by the plethora of logging trucks operating within the county. This combina-

tion makes it very difficult to keep all roads in optimum condition at all times. The evidence does not reveal any occasion on which the County Commissioners have refused to do road work on the basis of the race of the people who would benefit from such road work, nor does it reveal that complaints regarding roads in predominately white areas were accorded any greater concern than those in predominately black areas.

23. Another issue raised by the plaintiffs concerns work done by the County Commission on private property at the behest of private property owners and on city streets, two areas in which the county is not specifically authorized to conduct such operations. See Ala. Code §§ 11–3–10, 23–1–80, and 23 -1 130.[22] The evidence clearly revealed that on various occasions different commissioners have paved church parking lots, engaged in repair work on private property, and paved some city streets. The evidence, however, does not indicate any discriminatory basis on which such work was conducted, since the work was done for both black and white citizens.[23] The Com-

---

**21.** This is another situation in which the Court is of the opinion that the government attorneys have either breached the duty of their office or misconstrued their own responsibilities. See note 13, supra. Counsel for the government interviewed both Hope and Richardson concerning this road prior to the trial of this matter, and yet they called only Hope, whose testimony painted a picture of the road substantially different from that revealed by the testimony of Richardson.

Government attorneys from the Department of Justice appear in this Court as agents of the Attorney General of the United States, who is authorized by statute to "conduct and argue any case in a court of the United States in which the United States is interested." Title 28, U.S.C.A., § 518(b). Nowhere in the statutes is the interest of the United States defined, but this Court is firmly convinced that the conduct of the government attorneys in this particular instance is abhorrent to any interest of the United States. The Court recognizes that by virtue of the Voting Rights Act of 1965, the protection of voting rights for all Americans is a particularized interest of the United States, but the interest of the United States is best

protected by a full disclosure of the facts surrounding any alleged violation of that interest, not by selective presentation of the evidence indicating only those facts militating towards a violation of the interest. Accordingly, it is not the duty of the government attorneys to "make a case", for that can be left to private counsel. Government counsel has a duty to present all facts uncovered by their investigation, for their victory is justice, not a verdict for one party over another.

**22.** The plaintiffs appeared to contend at trial that such unauthorized labor is a criminal violation. The Court has not been able to find any statute specifically prohibiting this, nor have the plaintiffs directed the Court's attention to such a statute.

**23.** Testimony of Frank Norris, President of the Marengo County Commission, revealed that paving or other work is done in a city or town only after receipt of a request by the Mayor of that city or town.

The plaintiffs placed great emphasis on the fact that the Marengo County Commission had authorized paving work at a private school

missioners testified that they have always done such work, generally working on the requested projects when the equipment is in the area.

24. Perhaps most telling on the issue of responsiveness is the evidence put on by the defendants. The testimony revealed several areas in which the Marengo County Commission has acted voluntarily that have resulted in benefits of disproportionately more value to the black citizenry than to the white people.

The Marengo County Commission has provided facilities and transportation for an elderly nutrition program established under the auspices of the City of Linden and the Alabama-Tombigbee Regional Planning Council (Government Exhibit 8). The evidence reflects that more whites than blacks were served by this program; indeed, the program was on one occasion made the subject of charges of racial discrimination (Government Exhibits 3–6). However, it appears from the record that the discriminatory activities, if ever present, are no longer present, and that the program is now open to all elderly citizens of the county. At no time did the Marengo County Commission have any authority over who participated in the program.

A second service receiving County Commission support is the West Alabama Mental Health Center. The Mental Health Center offers a variety of services, including emergency and in- and out-patient facilities, and the Center has a branch office in Demopolis. Testimony revealed that the racial composition of the Marengo Countians who received services from the Center ran from 65% to 70% black to 30% to 35% white. A former director of the Center, Dr. Michael Mundy, testified that the Marengo County Commission provided $6,000.00 per year to the Center [24] and recently provided on-site construction assistance to the Center during the building of its new facility in Demopolis. Additionally, the County Commission has contracted with the Center to provide a psychologist for the Marengo County jail rehabilitational program which serves a jail population that is approximately 90% black. The evidence further revealed that the National Institute of Corrections has recently named the Marengo County jail as one of seven model correctional psychological programs.

Another area in which the Marengo County Commission has provided funding is the Marengo County Health Department, whose clientele was estimated by its director to be 75% to 80% black. While the Health Department does oversee some federally funded programs, it is nominally controlled by the State Health Department and receives funding and some of its facilities from the County Commission.

The County Commission also provides funding for the operation and maintenance of the Marengo County Public Library. The library, which is located in Linden, is open to all county residents, and in addition to books it has a film program, large print books, materials for the handicapped, a bookmobile, and it serves both private and public school students. The county funding for the library is used for the purchase of books, for funding of the library bookmobile, for payment of utilities, and for payment of the librarian's salary. The county librarian, Alyce Hartzelle, testified that the library's facilities are utilized by substantial numbers of both black and white county residents, but she could not estimate the percentage of the racial composition.

Another service made available to county residents through funding by the County Commission is paramedic and emergency rescue facilities. There are two rescue squads—the Marengo County Rescue Squad, Inc., and the South Marengo Rescue Squad. The first group has 35 white mem-

---

(Government Exhibit 16). However, the evidence revealed that the Commission was paid for the work and that the work was done over a three day holiday weekend resulting in no down time for county equipment. The Court finds no unresponsiveness or discrimination in such conduct.

**24.** The Center was also funded by state and federal funding.

bers,[25] while the second group is integrated with 26 blacks and 39 whites. The squads provide paramedic, fire, and recovery-rescue services to all county residents, regardless of race. Both of the organizations are volunteer units. The County Commission has provided funding for various pieces of equipment, and testimony revealed that the Commission has been receptive and responsive to other requests by the squads. There is no charge for the services provided by these squads.

The evidence revealed that the Marengo County Commission has provided many other services to county citizens too numerous for listing here, most of which were equally beneficial to blacks and whites and some of which were more beneficial to blacks.[26]

25. Very little evidence was put on regarding responsiveness of the defendant Board of Education, but very little was required since this Court takes judicial notice of the long and tortured history of the on-going federal litigation involving the Board, most recently summarized in *Lee v. Marengo County Board of Education*, 454 F.Supp. 918, 919–21 (S.D.Ala.1978). Solomon Seay, counsel for the plaintiff class in *Lee*, testified that he had more problems in seeking to achieve a unitary system in Marengo County than in any other system involved in the statewide litigation. He attributes this problem to the County Board's insensitivity to the needs of blacks, stating that his experience with the Marengo County Board of Education has led him to believe that they strive not to protect the interests of all people, but rather to make the system palatable to whites. Seay also alleges that facilities at predominately black schools are inferior to those at predominately white schools, but this was not substantiated by any other evidence, nor was it apparent to the Court on the Court's last inspection of these facilities. Seay ad-

mits that the Department of Justice intervened in the suit several years ago, and that the Department has played the leading role in the litigation since 1971.

Superintendent Fred Ramsey testified that the County Board has been more responsive to the needs of blacks than those of whites, which would seem proper in a system that is 80% black. 90% of allocated construction money has been spent on predominately black schools and Ramsey opined that all school children are being afforded equal educational opportunity. The record reflects that the Marengo County Board of Education sponsors some federally funded programs aimed at minorities and indigents such as Title I, but it is clear that the Board has not been nearly as dedicated towards seeking such funding as have some neighboring boards, such as that in Greene County.

The Court has had extensive experience with the Marengo County Board of Education and, if as the government contends the present system stands as evidence of official unresponsiveness to the needs of the blacks, then it is possible that such unresponsiveness lies in this Court, not with the Board. The Court cannot subscribe to this theory, however, for there is absolutely no evidence either in this case or in *Lee* that the educational needs of blacks have not been protected. Seay testified that he has received letters from blacks complaining about the system, but the Court has not received such letters and a survey of the *Lee* file does not disclose that they were ever brought to either this Court's attention or that of the School Board. At the minimum it would seem that allegations of unresponsiveness would require articulation of something requiring a response.

The Court's observation is that the major difficulties relating to the Marengo County

25. The testimony revealed that the group has no restriction against black members, only that no blacks had ever applied.

26. Among other programs receiving funding or other support from the Marengo County Commission are a recreation facility at Myrtlewood, the Demopolis Airport, a county-wide solid

waste program, the South Marengo Water and Fire Prevention System, CETA, housing for county Board of Education, FHA, Forestry Service, Soil Conservation, VA, and Department of Pensions and Security offices, and site preparation work for industry and public schools.

School System are the intractible attitudes of the Superintendent and the Department of Justice lawyers. Counsel in the matter *sub judice* imply that the Marengo County Board of Education's failure to accede to the proposals of the government attorneys in the *Lee* case indicates unresponsiveness to black needs, apparently on the basis that the Department of Justice is representing the interests of Marengo County blacks. The Court's experience is that such attorneys do not, as they should not, represent black interests, but rather the interest of the United States Government, which has adopted a facially neutral desegregation policy that in many respects receives no greater support in the black community than it does in the white community. Accordingly, while the Court does agree with Seay to some extent insofar as the main objective of the County Board appears to the Court to be to make the system as palatable to whites, the Court does not feel that any unresponsiveness to black needs has had a serious impact on equal educational opportunities in Marengo County. The Court notes further in this regard that the Marengo County Board of Education has had a black member since 1976 and that his presence on the Board has not resulted in substantial changes in the Board's operation of the schools, although it is not likely that one man can swing great weight on a five member board.

26. The Court elects not to enter any specific findings with respect to the system in general, these matters having previously been set forth in *Lee v. Marengo County Board of Education, supra.* The Court notes only that the Board has provided school children in the county equal educational opportunities through the adoption of a unitary system, that the achievement of such a system was achieved only after extensive litigation, and that had blacks possessed adequate input in the system, it probably would not have taken so long to achieve.

**27.** Government Exhibit 25 reflects that 90% of the black employees made between $4,000.00 and $6,000.00 a year. The white employees

27. The second area for the Court's attention on the responsiveness issue is the distribution of jobs and appointments to various boards and commissions. This is of course an important consideration for such distribution and appointments are among the major functions of local government.

28. The Equal Employment Opportunity Commission State and Local Government Information Reports [hereinafter EEO–4], filed by Marengo County for the year 1974 (Government Exhibit 24) reveals the following breakdown of county employees:

| | Total Employees | Black | White |
|---|---|---|---|
| Officials/Administration | 1 | 0 | 1 |
| Professionals | 4 | 0 | 4 |
| Technicians | 1 | 0 | 1 |
| Protective Services | 3 | 1 | 2 |
| Para-Professionals | 7 | 0 | 7 |
| Office/Clerical | 4 | 0 | 4 |
| Skilled Craft | 25 | 8 | 17 |
| Service/Maintenance | 26 | 13 | 13 |
| | 71 | 22 | 49 |

One of the two highest paid employees was a black professional, and there was little disparity between the amounts paid to blacks and whites in the same job category, but the Court notes that blacks comprised only 25.3% of the labor pool in a county that is 50% black and that the service/maintenance category, in which most blacks were employed, was one of the lowest paying categories.[27]

29. The EEO–4 reports for 1976 in Marengo County reflect the following breakdown by race:

| | Total Employees | Black | White |
|---|---|---|---|
| Officials/Administration | 6 | 0 | 6 |
| Professionals | 2 | 1 | 1 |
| Technicians | 3 | 0 | 3 |
| Protective Services | 5 | 1 | 4 |
| Para-Professionals | 2 | 0 | 2 |
| Office/Clerical | 2 | 1 | 1 |
| Skilled Craft | 24 | 0 | 24 |
| Service/Maintenance | 35 | 17 | 18 |
| | 79 | 20 | 59 |

The highest paid employees in 1976 were all white and, although the percentage of blacks increased, it was still short of the

were more successful, with 49.4% receiving $4,000.00 to $6,000.00 a year and 40.5% receiving $6,000.00 to $8,000.00 per year.

county-wide percentage and blacks still seemed tied to the lower paying jobs.[28]

30. There was very little evidence put on respecting appointments made by the Marengo County Commission to various boards and commissions within the county. The evidence did disclose that the Marengo County Library Board has no black members and that the five member Marengo County Water Board has only one black member. Additionally, the evidence revealed that there are two blacks among the nine members of the Marengo County subcommittee of the Alabama-Tombigbee Regional Planning Commission.

31. The parties put on no evidence with respect to the employment or appointment policies of the Marengo County Board of Education, but the Court can resort to figures submitted in the *Lee* litigation to some extent. The reports submitted by the Board in *Lee* indicate that the system wide faculty ratio was 70% black to 30% white in March of 1977, and that this ratio has existed for some time. *See Lee v. Marengo County Board of Education, supra* at 929– 30. Of course the Court has no way of knowing whether there is any disparity in pay between black and white teachers, but from the evidence available to the Court it appears that the employment practices of the School Board are free from any racial animus.[29]

32. The assignment of faculty is somewhat more clear than the hiring issue. This Court has strived long and hard to achieve compliance by the School Board with the dictates of *Singleton v. Jackson Municipal Separate School District,* 419 F.2d 1211 (5th Cir. 1970), and such compliance was not

actually obtained until the present school year. This indicates an unresponsiveness on the part of the Board to the dictates of the law, but the Court doubts that such unresponsiveness was injurious to black needs in particular.[30]

## C. State Policy

33. The *Hendrix* decision is also instructive with respect to this Court's duty to consider whether there is a state policy indicating a preference for at-large districts:

Although motive is not a direct issue in the dilution context, this factor is used by the courts to determine how skeptically a given at-large system should be regarded. In our federal systems states can choose those techniques of electing officials which suit their local requirements. The adoption of an at-large scheme in a state which has not often used such a mechanism casts the scheme in a dubious light and indicates that it may be a tool of minority vote dilution.

*Hendrix v. Joseph, supra* at 1269. The task for the Court clearly is to look behind the face of the election scheme to ascertain the motivation of the legislature in enacting the scheme. This Court has already stated that "[t]here is no clear cut State policy either for or against multi-member districting or at-large elections in the State of Alabama, considered as a whole. The lack of State policy therefore must be considered as a neutral factor." *Bolden v. City of Mobile, supra,* 423 F.Supp. at 393.

With respect to the state policy specifically regarding Marengo County, the Court

---

**28.** Government Exhibit 25 reflects that 36.36% of the black employees were still in the $4,000.00 to $6,000.00 range in 1976, while the biggest group, 56.1%, was in the $6,000.00 to $8,000.00 range. Most whites, 63.4%, were in the $6,000.00 to $8,000.00 range.

**29.** The Court has no information regarding the hiring of school staff other than teachers, but the Court notes that all questions in the *Lee* case touching on faculty and staff have been tied to assignment, as opposed to hiring, practices.

**30.** This failure to comply, the Court believes, can be attributed to the failure of the School Board to take an active stance to ensure that the law is carried out. Testimony of Moses Lofton, the black School Board member, revealed that the Board relied upon the Superintendent to carry out the orders of this Court and that the Board rarely interfered with his work. It is clear to the Court that Superintendent Ramsey was not aware of the precise impact of the *Singleton* decision prior to a recent hearing in the *Lee* case, and the Court is of the opinion that greater Board assistance and oversight would be proper.

finds that the County Commission form of government was first authorized in 1923. *See 1923 Local Acts of Alabama*, No. 311, at 188. Although known at that time and until recently as the Marengo County Board of Revenue, it has clearly been a commission form of government at all times. The Act provides for the election of all commissioners by at-large balloting, and a later amendment authorized the staggering of the four year terms. *1966 Acts of Alabama*, No. 44, at 67. Similarly, the Marengo County Board of Education president and member elections have been at-large since 1935, *see 1935 Local Acts of Alabama*, No. 183, at 106, and these terms were also staggered by a 1966 amendment. *1966 Acts of Alabama*, No. 44, at 67.

34. It cannot be said that the at-large scheme is unusual in the context of election procedures in other Alabama counties, since previous cases have recognized that half of the Alabama counties have at-large elections, *see Hendrix v. Joseph, supra* at 1269–70; *Reese v. Dallas County*, 505 F.2d 879, 882 n. 2 (5th Cir. 1974), and it appears that presently 50 of the 67 counties have at-large procedures. Defendants' post-trial brief at 44, 60–79. Indeed, the defendants' calculations indicate that 47 Alabama counties (70.1%) have had at-large procedures for a majority of the time since 1850. Such at-large procedures are specifically permitted by statute. *Ala. Code* 11–3–1. So it is quite clear that the Marengo County election procedures are in no way rare or unique in comparison to other Alabama counties, but rather are exemplary of the typical policy followed in most counties. The Court, however, is not convinced that such evidence indicates a state policy in favor of the Marengo County procedure, the Court rather being of the opinion that, as in *Bolden, supra*, the state policy is neutral. *See, e. g., Kirksey v. City of Jackson*, 461 F.Supp. 1282, 1291 (S.D.Miss.1978) ("[T]here is lacking herein sufficient interest in at-large districting to allow a finding that there is an extant state policy in favor of at-large districting of city government.").

Tangentically, the Court notes that since the election procedures in question were enacted in 1923 and 1935 when blacks had been effectively disenfranchised, there can be no allegation that the at-large schemes were racially motivated in their enactment. *Hendrix v. Joseph, supra* at 1270, *citing McGill v. Gadsden County Commission*, 535 F.2d 277 (5th Cir. 1976).

## D. Past Discrimination

35. The final primary consideration of the Court in a dilution case is the nature and the extent of past discrimination in the subject area, together with an inquiry into whether such past discrimination precludes effective present participation in political affairs. The concern is whether the lingering effects of such discrimination interfere with present rights:

> [T]he issue here of course is not whether Rapides Parish discriminated against blacks in the past, but rather whether any debilitating effects of that discrimination still persist. . . . In previous cases such debilitating effects have usually been shown by a relatively large discrepancy between the size of the black population and the number of registered black voters . . .

*Bradas v. Rapides Parish Police Jury*, 508 F.2d 1109, 1112 (5th Cir. 1975), *quoted in Hendrix, supra* at 1270. Although this precise measurement is unavailable in the matter *sub judice* due to the lack of evidence regarding either the number of blacks eligible to vote or the number of blacks actually registered, there is extensive evidence of past discrimination and some evidence of lingering effects.

36. There can be no question but that blacks in Alabama in general and in Marengo County in particular suffered greatly in the past from racial discrimination, both subtle and pervasive. Prior to the passage of the Voting Rights Act in 1965 there was little or no black participation in political affairs in the State of Alabama, blacks having been for the most part disenfranchised. This was equally true in Marengo County. As noted in *Brown v. Moore*, 428 F.Supp. 1123, 1131 (S.D.Ala.1976), the disenfran-

chisement was in large part attributable to the 1901 Constitutional Convention, which was called to effect such disenfranchisement among other things. Prior to the Voting Rights Act's implementation in 1965 some gains had been made, most, if not all, through litigation in the federal courts. Literacy tests, which had served as a tool to discriminate against black voting applicants, were invalidated in 1949. *Davis v. Schnell*, 81 F.Supp. 872 (S.D.Ala.1949). Racial gerrymandering of districts for elections was outlawed on two separate occasions. *Gomillion v. Lightfoot*, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960); *Sims v. Baggett*, 247 F.Supp. 96 (M.D.Ala.1965). Following passage of the Act the courts were called upon to compel the placing of black candidates' names on the ballot, *Hadnott v. Amos*, 394 U.S. 358, 89 S.Ct. 1101, 22 L.Ed.2d 336 (1969), to compel the Democratic Executive Committees of three counties (including Marengo) to permit federal observers to be present during the casting of ballots, *United States v. Greene County Democratic Executive Committee*, 254 F.Supp. 543 (N. & S.D.Ala.1966), to invalidate the state-imposed poll tax, *United States v. Alabama*, 252 F.Supp. 95 (M.D. Ala.1966), and to invalidate party primary filing fees. *Harper v. Vance*, 342 F.Supp. 136 (N.D.Ala.1972). There have been numerous other cases unrelated to voting rights in which Alabama blacks have been compelled to seek recourse in the federal courts to protect their constitutional rights, such as employment and housing discrimination matters and criminal proceedings.

37. With specific reference to Marengo County, the state-wide litigations mentioned above were, for the most part, equally applicable on the local level. The federal courts have been called upon to rid Marengo County of systematic exclusion of blacks from grand and petit jury venires, *Black v. Curb*, 422 F.2d 656 (5th Cir. 1970), to enforce the rights of blacks under the Voting Rights Act of 1965, *United States v. Marengo County Democratic Executive Committee*, Civil Action No. 4086–66 (S.D.Ala.); *United States v. Marengo County*, Civil Action No. 1567 (S.D.Ala.), and to eliminate the segregated school system that formerly existed in Marengo County. *See, e. g., Lee v. Marengo County Board of Education*, 588 F.2d 1134 (5th Cir. 1979); *Lee v. Macon County Board of Education*, 465 F.2d 369 (5th Cir. 1972) (Marengo County System); *Lee v. Marengo County Board of Education*, 454 F.Supp. 918 (S.D.Ala.1978); *Lee v. Linden City School System*, Civil Action No. 5945–70–H (S.D.Ala., July 13, 1978). The changes came slowly and were accepted with great reluctance by the white population, but the Court is of the opinion that most if not all, vestiges of past official discrimination in Marengo County have been eradicated.[31]

38. It is clear that racial discrimination in the past was pervasive in Marengo County, but the more narrow issue for the Court's consideration is whether such past discrimination has in any way precluded effective present participation by blacks in Marengo County political affairs. The plaintiffs adduced very little evidence on this point. They first point out that blacks comprise a majority of the population in Marengo County but a minority of the registered voters, apparently seeking to come within the language of *Bradas, supra*. As noted above, however, it is not a comparison between the percentage of the population and the percentage of the registered voters

31. The Court does not now find, nor is it ever likely to find at any time in the near future, that all racial discrimination has disappeared in Marengo County. This would be true, of course, anywhere in the country. Man is by nature discriminatory in his actions, and it must be termed unfortunate that the cause of history has led to people making discriminatory choices on a racial basis. The fact that individual racism persists in Marengo County among both blacks and whites is of no moment to this litigation, however, for the Constitution speaks not to the manner in which individuals are treated by others, but rather to the manner in which individuals are treated by government. In saying this, the Court does not lose sight of the fact that much of the private discrimination or racism now existing is attributable to the past history of official discrimination. It is likely that the law can change men's ways but not their minds.

that is controlling, but rather the comparison between the percentage of the eligible black voters and the percentage of the registered black voters.[32] Another alleged lingering effect is the alleged intimidation of black voters by white employers and landowners. This issue was described above in connection with the access issue, and the Court found absolutely no evidence that the assertions were true, finding rather that the assertions themselves and the testimony surrounding them appeared to be fabricated for use in this case. A final argument advanced on this point was made by one witness who described past discrimination as a "force" that effectively served to limit black participation. It is of course very difficult, probably impossible, for a white fact-finder to fully grasp the essence of this alleged "force," but the Court does not question the sincerity of the witness. However, while the witness' assertion may have been a good faith estimation of his perception of the present effect of past discrimination, the Court is bound to predicate its decision on articulable facts and this witness was not able to describe any such facts.

39. The Court is more persuaded on this point by the number of black candidates (73) and the efforts of black interest groups since implementation of the Voting Rights Act. The evidence surely does not indicate that any blacks have been dissuaded by past discrimination from testing the political waters, nor does it appear that history has served to quiet their collective and individual political voices.

## E. Enhancing Factors

■ The last issues for the Court's concern are the enhancing factors of whether there is a majority vote requirement, whether districts are extremely large,

whether there is an anti-single shot provision, and whether there is a provision allowing at-large candidates to run from a particular geographical sub-district. *Zimmer, supra* at 1305.

Marengo County candidates do face majority vote requirements in primary elections, and run-offs are often required when there are three or more candidates for a party's nomination to a particular office and none receives a majority. However, there is no majority vote requirement in the general elections—the candidate who receives the plurality of the votes being declared the winner. On the basis that the Democratic Party primary is for all intents and purposes *the election* in Alabama, the Court finds that the majority vote requirement tends to enhance a finding of dilution.

With respect to the size of the district, the Court finds that Marengo County is a small voting district in terms of population, and that this factor militates in favor of the defendants. There are 23,000 Marengo County residents, while the average county governing district has a population of 47,848. *Hendrix v. McKinney*, 460 F.Supp. 626, 636 (M.D.Ala.1978). Although this appears to be the test set out by the Fifth Circuit in *Hendrix v. Joseph*, 559 F.2d 1265, 1270 (5th Cir. 1978), there is a geographical consideration that militates against the defendants. Marengo County is the tenth largest in area of the 67 counties in Alabama, and it is for the most part extremely rural. Two incumbent commissioners testified that their most recent campaigns cost between $2,000.00 and $4,000.00. In a county in which the per capita income of whites greatly exceeds that of blacks, the geographical size of the district must be considered as an enhancement of dilution, at least on the question of access.

---

32. *See Bradas, supra* at 1112. Many factors could explain the difference between the percentage of the population and the percentage of the registered voters. Two are revealed by the evidence in this case: First, 1970 Census figures reveal that the voting age population is much closer to being evenly split along racial lines than is the population as a whole; and, second, 90% of the inmates at the Marengo County Jail are black and, under Alabama law,

convicted felons relinquish their right to vote. Of course these inmates would have no great bearing on the figures, but this is exemplary of reasons other than discrimination affecting the number of black voters. In any event, there may still be some question with respect to the precise comparison that is appropriate under the Fifth Circuit's holdings. *Compare Bradas, supra* at 1112 with *Zimmer, supra* at 1306.

There is no anti-single shot voting provision in Marengo County, but since candidates run for specific positions the Court is of the opinion that this is a neutral factor.

There is provision for at-large candidates running from specific geographical subdistricts by virtue of the residency requirements for County Commission and Board of Education elections. The Court finds that this factor militates in favor of the defendants.

## CONCLUSIONS OF LAW

### I. Authority of the Attorney General to Participate

There is a threshold jurisdictional question that, due to the short period of time between the filing of the complaint and the trial of the enforcement action, has not yet been considered by the Court. In plain terms, the jurisdictional question arises out of a dispute with respect to whether the Attorney General of the United States has authority to prosecute a voting rights action alleging dilution or cancellation of black voting strength. The defendants characterize the issue as one of standing, while the government argues that only the jurisdiction of the Court is involved. No matter what characterization is given to the issue, the Court's analysis is the same, for the ultimate inquiry is whether the government is authorized to prosecute an action of this nature.

In its complaint, the government alleges that the action is brought under authority of Title 42, U.S.C.A., §§ 1971(a), 1971(c), 1973, and 1973j(d), and the Fourteenth and Fifteenth Amendments to the United States Constitution, invoking the jurisdiction of this Court under Title 28, U.S.C.A., § 1345 and Title 42, U.S.C.A., §§ 1971(d) & 1973j(f).

 The Court's analysis must start with the observation that this precise issue has never been resolved in any federal court. There is no question but that the United States is authorized to initiate lawsuits to ensure those voting rights protected under Title 42, U.S.C.A., § 1971. *United*

*States v. Mississippi,* 380 U.S. 128, 85 S.Ct. 808, 13 L.Ed.2d 717 (1965); *United States v. Democratic Executive Committee of Barbour County,* 288 F.Supp. 943 (M.D.Ala. 1968); *United States v. Bibb County Democratic Executive Committee,* 222 F.Supp. 493 (M.D.Ga.1962); *United States v. Raines,* 189 F.Supp. 121 (M.D.Ga.1960). None of these decisions is particularly helpful to the Court in the matter *sub judice,* however, since three of the cases dealt with clear segregative practices prohibited under the statute, and *Barbour County* dealt with quantitative dilution, in the nature of one-man one-vote, instead of qualitative, as now confronts this Court. There have been other enforcement actions brought by the Attorney General to challenge at-large voting systems as dilutive of black voting strength, but apparently none of these cases have considered the authority of the government to participate in and prosecute such actions. *See United States v. Board of Supervisors of Forrest County,* 571 F.2d 951 (5th Cir. 1978); *United States v. City of Albany,* 399 F.Supp. 459 (M.D.Ga.1975); *United States v. City Commission of Texas City,* Civil Action No. G–77–78 (S.D.Texas 1978); *United States v. Temple Independent School District,* Civil Action No. W–78–CA– 10 (W.D.Texas 1978). It is clear, therefore, that this is a question of first impression for this Court.

Section 1971(a)(1) provides that:

All citizens of the United States who are otherwise qualified by law to vote at any election by the people in any State, Territory, district, county, city, parish, township, school district, municipality, or other territorial subdivision, shall be entitled and allowed to vote at all such elections, without distinction of race, color, or previous condition of servitude . . . .

Section 1971(a)(2) prohibits the application of differing standards to different. applicants in determining voter qualifications, prohibits the denial of the right to vote for non-material errors or omissions on the voting records, and prohibits the use of literacy tests as a precondition to voting rights unless such tests are administered in writing

and the test results are presented to the applicant after the test. For the purposes of section 1971(a), the term "vote" is defined as including "all action necessary to make a vote effective including, but not limited to, registration or other action required by State law prerequisite to voting, casting a ballot, and having such ballot counted and included in the appropriate totals of votes cast with respect to candidates for public office . . ." Title 42, U.S. C.A., § 1971(e).

The Attorney General of the United States is authorized to prosecute a voting rights action for injunctive relief whenever any person has engaged in or there is reasonable cause to believe that any person is about to engage in any act in violation of section 1971(a). Title 42, U.S.C.A., § 1971(c). Jurisdiction is conferred on the United States District Court to hear such actions by section 1971(d).

 The Court has exhaustively considered the language of section 1971 and the legislative history behind the adoption of the statute, 1957 *U.S. Code Congressional and Administrative News* p. 1966, and the Court is of the opinion that the complaint filed by the United States in this action fails to state an actionable claim under section 1971. The Court reaches this decision upon the conclusion that section 1971 was not intended by Congress to extend as far as the government would extend it in this case. The Court views this section as a statutory embodiment of the Fifteenth Amendment intended only to preclude denials by persons acting under color of state law of the right to vote to other persons where such denial is based upon race, color, or previous condition of servitude. There is no expression or allegation in the government's complaint from which it might be inferred that the defendants have in any way denied to any person the right to vote on such a basis. The complaint, rather, is directed only toward the weight of the vote actually possessed by Marengo County residents. Had Congress intended by this section that each person's vote be accorded a racially blind, qualitatively equal effective-

ness, then no doubt such intent would have been spelled out more clearly by the statute. Since this intent is not so spelled out, the Court finds no cause of action stated under section 1971.

 The government also asserts that its participation is justified by the Voting Rights Act of 1965, Title 42, U.S.C.A., §§ 1973 & 1973j(d). Section 1973 provides that:

> No voting qualification or prerequisite to voting, or standard, practice, or procedure shall be imposed or applied by any State or political subdivision to deny or abridge the right of any citizen of the United States to vote on account of race or color.

This statute is enforceable by the Attorney General under the terms of Title 42, U.S. C.A., § 1973j(d), which provides that:

> Whenever any person has engaged or there are reasonable grounds to believe that any person is about to engage in any act or practice prohibited by section 1973 . . . the Attorney General may institute for the United States, or in the name of the United States, an action for preventive relief . . . .

An analysis of these statutes and the legislative history surrounding their adoption leads the Court to the conclusion that the complaint of the government in this case does state a cause of action under section 1973. The statute on its face speaks to "qualification or prerequisite to voting, or standard, practice, or procedure" that might be imposed by a state or a political subdivision to deny or abridge the right to vote on the basis of race or color. The Court reads the complaint most favorably in behalf of the government, as it must do on a motion to dismiss, and the Court is convinced that allegations that an at-large voting system serves to dilute or cancel black voting strength, if proved, would amount to an actionable claim under section 1973 by virtue of the fact that the procedure employed would be guilty of abridging the right to vote on the basis of race or color.

■ Section 1973, as a portion of the Voting Rights Act of 1965, was "designed primarily to enforce the 15th Amendment to the Constitution of the United States and [was] also designed to enforce the 14th Amendment and article I, section 4." 1965 *U.S. Code Congressional and Administrative News*, pp. 2437, 2439–44. The statute does not define standard, practice, or procedure, nor has it been construed by any of the cases dealing with the statute. The Court, however, is of the opinion that the congressional intent was to abolish all requirements that might preclude blacks or other minorities from voting. In *South Carolina v. Katzenbach*, 383 U.S. 301, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966), the United States Supreme Court, in affirming the constitutionality of the Voting Rights Act of 1965, viewed the Act as aimed toward the elimination of the procedural hurdles imposed upon black voters. The Court described some of the procedural hurdles that had been employed since ratification of the Fifteenth Amendment:

The course of subsequent Fifteenth Amendment litigation in this Court demonstrates the variety and persistence of these and similar institutions designed to deprive Negroes of the right to vote. Grandfather clauses were invalidated in *Guinn v. United States*, 238 U.S. 347, 35 S.Ct. 926, 59 L.Ed. 1340 [LRA 1916A 1124,] and *Myers v. Anderson*, 238 U.S. 368, 35 S.Ct. 932, 59 L.Ed. 1349. Procedural hurdles were struck down in *Lane v. Wilson*, 307 U.S. 268, 59 S.Ct. 872, 83 L.Ed. 1281. The white primary was outlawed in *Smith v. Allwright*, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 [151 ALR 1110,] and *Terry v. Adams*, 345 U.S. 461, 73

S.Ct. 809, 97 L.Ed. 1152. Improper challenges were nullified in *United States v. Thomas*, 362 U.S. 58, 80 S.Ct. 612, 4 L.Ed.2d 535. Racial gerrymandering was forbidden by *Gomillion v. Lightfoot*, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110. Finally, discriminatory application of voting tests was condemned in *Schnell v. Davis*, 336 U.S. 933, 69 S.Ct. 749, 93 L.Ed. 1093. *Alabama v. United States*, 371 U.S. 37, 83 S.Ct. 145, 9 L.Ed.2d 112; and *Louisiana v. United States*, 380 U.S. 145, 85 S.Ct. 817, 13 L.Ed.2d 709.

383 U.S. at 311–12, 86 S.Ct. at 810, 15 L.Ed.2d at 777. Had the Supreme Court stopped at this point the Court would conclude from the thrust of the *Katzenbach* language that the type of action brought here is not within the scope of the Voting Rights Act of 1965, for it is clear that the Supreme Court envisioned, in the foregoing language eradication of all official impediments to black voting rights in the sense that blacks would not be denied the right to vote, without consideration of such subtle matters as dilution or diminution of the weight of the vote actually allowed. However, the *Katzenbach* Court stated further that "[t]he Voting Rights Act of 1965 reflects Congress' firm intention to rid the country of racial discrimination in voting." 383 U.S. at 315, 86 S.Ct. at 812, 15 L.Ed.2d at 779. Since the essence of a dilution suit is the allegation that racially discriminatory voting procedures have resulted in dilution or cancellation of a minority's voting strength, this Court is of the opinion that the government's complaint in this action states an actionable claim under section 1973, and that the Attorney General's participation is authorized by section 1973j(d).[33]

**33.** This conclusion is buttressed by the finding in *Katzenbach* that the remedies for voting rights violations prescribed prior to the 1965 Act had been largely ineffective, apparently the Court concluded that the Act was intended to supplant or at least supplement private actions brought under the Fifteenth Amendment. *South Carolina v. Katzenbach*, 383 U.S. 301, 309, 86 S.Ct. 803, 808, 15 L.Ed.2d 769, 775–76 (1966). *See also Allen v. Board of Elections*, 393 U.S. 544, 556 n. 21, 89 S.Ct. 817, 827, 22 L.Ed.2d 1, 12 (1969). Further support is found

in the *Allen* decision, *supra*, where the Court emphasized that section 1973 is to be broadly construed where invoked as a jurisdictional vehicle:

The legislative history on the whole supports the view that Congress intended to reach any state enactment which altered the election law of a covered State in even a minor way. For example, § 2 (Title 42, U.S. C.A., § 1973) of the Act, as originally drafted, included a prohibition against any "qualification or procedure." During the Senate Hear-

The Court has no problems with respect to the claims of the plaintiff class members since such actions have been implicitly, if not explicitly, approved by the Supreme Court in both *Whitcomb v. Chavis*, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1973) and *White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973).

## II. *Aggregation of the Dilution Factors*

 The Court having made specific findings concerning both the primary and secondary indicia of dilution as set forth in *Zimmer* must now determine the ultimate issue of fact—in whose favor does the aggregate of the factors preponderate? The Court includes this finding of ultimate fact in its conclusions of law simply because it is a factual conclusion based upon legal guidelines. In reaching a determination with respect to the aggregate of the factors, the Court's duty is to "examine and weigh the competing facts to determine whether the incidence of those facts probative of intentional discrimination are sufficient to establish such a finding . . ." *Kirksey v. City of Jackson*, 461 F.Supp. 1282, 1311 (S.D.Miss.1978). Since this is a constitutional challenge there is a preliminary requirement that intentional invidious discrimination be established. *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). However, it is clear that such intentional discrimination may be inferred from the existence of particular facts revealed by the aggregation of the *Zimmer* factors.[34] *See Nevett v. Sides*, 571 F.2d 209 (5th Cir. 1978) (*Nevitt II*). In reaching its decision on the aggregation of the factors this Court has kept well in mind that:

> [d]ilution is an elusive concept because it cannot be proven by mathematics alone. It reflects a challenge to the usual election system wherein the candidate of the majority of the voters wins the election. Dilution unconstitutionally abridges or dilutes meaningful participation by a minority by virtue of the fact that a majority of the voters, and the successful governing authority elected by that majority simply ignore the governmental needs of a substantial minority of the voters and remains arrogant and unresponsive to the voting strength of that minority. It constitutes a violation of the Fourteenth and Fifteenth Amendment guarantee that all citizens and classes of citizens be afforded some meaningful participation in the election process, not just the right to cast a vote.

*Kirksey v. City of Jackson*, 461 F.Supp. 1282, 1311 (S.D.Miss.1978), *citing Davis v. Garrison*, 553 F.2d 923, 925 (5th Cir. 1977).

Having considered all of the factors relevant in a dilution inquiry, the Court finds the following conclusions to be proper under the evidence presented:

(a) There is absolutely no lack of access for blacks to the political processes in Marengo County. The Court finds no impediments, official or otherwise, to black persons registering to vote, casting their bal-

---

ings on the bill Senator Fong expressed concern that the word "procedure" was not broad enough to cover various practices that might effectively be employed to deny citizens the right to vote. In response, the Attorney General said he had no objection to expanding the language of the section, as the word "procedure" was intended to be all-inclusive of any type of practice. Indicative of an intention to give the Act the broadest possible scope, Congress expanded the language in the final version of § 2 to include "any voting qualification or prerequisite to voting, or standard, practice, or procedure." 393 U.S. at 566–67, 89 S.Ct. at 832, 22 L.Ed.2d at 17–18 (footnote omitted).

**34.** In *Nevett II*, the Fifth Circuit rejected the tort standard of intent that was employed by this Court in *Bolden v. City of Mobile*, 423 F.Supp. 384 (S.D.Ala.1976) and *Brown v. Moore*, 428 F.Supp. 1123 (S.D.Ala.1976), and the quasi-impact test employed in *Village of Arlington Heights v. Metropolitan Housing Development Corporation*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), relying on an "inference of intent" test that is predicated upon the amalgamation of the factors. *Nevett II*, 517 F.2d 217. The validity of this analysis has been questioned, Note, *Vote Dilution Challenges after Washington v. Davis*, 30 Ala.L.Rev. 396, 415 (1979), and the question has been presented by certiorari to the United States Supreme Court, but this Court is bound to apply the law as it now stands.

lots, and having their votes properly tabulated. Nor does the Court find any such impediment to black candidates, since it is clear that black persons as well as whites are equally allowed to seek public office, including filing campaign papers, seeking votes, and having their names placed on the ballot. The fact that there is clear evidence of racially polarized voting does not persuade the Court that there is a lack of access in a district in which blacks control over 40% of the total vote, in which blacks have actively sought public office on various occasions, and in which there is no evidence of racism in the official policies and individual campaign practices in the local elections. It is unfortunate that electors would allow racial bias to override a candidate's qualifications, but the Court is convinced that under the totality of the circumstances in this case a mere showing that there has been polarization of the votes in past elections is not sufficient to establish that there is any lack of access to the political processes for blacks. The only lack of access visible to the Court is the inferential lack deriving from the fact that Marengo County whites exist on a higher socioeconomic strata than blacks. *See Kirksey v. Board of Supervisors of Hinds County*, 554 F.2d 139 (5th Cir. 1977).

(b) Nor does the Court find any substantial lack of responsiveness on the part of the governing authorities. While there was some evidence that blacks have been ignored to some extent in the areas of road construction, employment, services, and education, the other evidence establishes that many programs have been initiated that are more favorable to blacks than to whites. The Court is confident that any action taken by any governing authority will have a different effect on one group of people than it does on another, so the fact that there is some evidence of some unresponsiveness does not persuade the Court that the conduct of that governing authority is to be characterized as unresponsive. As with the access issue, the totality of the evidence in this case simply does not support the allegations of the plaintiffs. The Court is not unaware of the importance of its findings on the responsiveness issue,[35] and most of the time spent on consideration of the findings was on review of the evidence touching on responsiveness. Where, as here, there is evidence of even-handed policy in most respects, with isolated improprieties in most cases involving no racial discrimination, it simply cannot be said that the governing authority is unresponsive. With respect to the Marengo County Board of Education, the plaintiffs established only that that body has been unresponsive to the efforts of the United States Department of Justice, not that they have been unresponsive to the needs of blacks. If the Department of Justice is under the misapprehension that they speak for the majority of the blacks in Marengo County, they certainly failed to establish it by any credible evidence.

(c) The state policy behind the at-large system employed in Marengo County elections is tenuous at best, and deserves only to be treated as a neutral issue. *See Brown v. Moore*, 428 F.Supp. 1123, 1131 (S.D.Ala. 1976); *Bolden v. City of Mobile*, 423 F.Supp. 384, 393 (S.D.Ala.1976).

(d) The Court finds that lingering effects of past discrimination have played a role in Marengo County elections. There can be no question but that the racism of the past has led to the present racial polarization in voting. And certainly the indignities thrust upon blacks in the past are still well within their minds when they cast their ballots or consider the pursuit of political office. But the Court's inquiry is whether the past discrimination has present effects, and the Court finds such effects to be limited. First, blacks have suffered from inadequate representation among poll officials, which the Court clearly deems to be a present effect of past discrimination. Second, blacks apparently have some reticence with

---

**35.** In *Blacks United for Lasting Leadership v. City of Shreveport*, 571 F.2d 248, 254 (5th Cir. 1978), the Court of Appeals noted that "[t]he issue of responsiveness in a case like this is momentous. Its resolution has considerable probative [value] on the question whether the plan is being purposefully maintained."

respect to publicly expressing political opinion, which must be the result of past discrimination since there was no evidence of any present practice that would encourage such attitude. Finally, there is no question but that the past history of racial discrimination has a present adverse effect on blacks seeking change, political or otherwise, for the record is clear that such changes for blacks have always required an inordinate amount of effort. From the totality of the evidence the Court finds that there are present lingering effects of past discrimination among blacks in Marengo County, but that the effects do not manifest themselves so completely in political matters as they do in other everyday affairs.

(e) Among the enhancing factors the Court finds that the majority vote requirement and the large geographical boundaries of the Marengo County district militate toward a finding of dilution, while the other relevant considerations do not apply.

### III. Conclusion

■ The plaintiffs are not required to prove discriminatory intent in the enactment of the challenged procedure, the question is whether the procedure has been maintained by either action or inaction "for the purpose of excluding minority input or devaluing the votes of minorities . . ." *Kirksey v. City of Jackson*, 461 F.Supp. 1282, 1313 (S.D.Miss.1978), *citing Nevett II, supra* at 222; *Bolden v. City of Mobile*, 571 F.2d 238, 245–246 (5th Cir. 1978); *Thomasville Branch of NAACP v. Thomas County*, 571 F.2d 257 (5th Cir. 1978). The at-large procedure in the instant case was initiated in race-proof circumstances so the question is whether it is maintained as an "instrumentality for carrying forward patterns of purposeful and intentional [segregation]." *Kirksey v. Board of Supervisors of Hinds County*, 554 F.2d 139, 147 (5th Cir. 1977).

■ On the basis of the Court's findings on the aggregate of the *Zimmer* factors, the Court is of the opinion that the plaintiffs have failed to establish by a preponderance of the evidence that intentional discrimina-

tion is the motivating factor in the maintenance of the present at-large election system employed in Marengo County. The present effects of past discrimination enhanced by the majority vote requirement and the large geographical district do not, in this Court's opinion, preponderate over the fact that blacks have equality of access to the slating process and the fact that elected officials have been fairly responsive to the needs of blacks, in most instances conducting their business in a racially blind, even-handed manner. Accordingly, the Court is of the opinion that judgment in these matters is due to be entered in favor of the defendants in both the class action and the enforcement action.